

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00299-CR

_____


TYLER LEE MILLER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CR20041

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

A jury found appellant Tyler Lee Miller guilty of evading arrest or detention with a vehicle, a deadly weapon. *See* Tex. Penal Code Ann. § 38.04(a), (b)(2)(A). After Miller pleaded true to four enhancement paragraphs, the trial court sentenced him to 13 years' imprisonment.

In four issues, Miller asserts that

1. he suffered egregious harm because the jury charge did not include an instruction on improperly admitted evidence;

2. he suffered egregious harm when the fact issue of whether he used his blinker was not submitted to the jury;[1]

3. the evidence was insufficient to prove that he was lawfully stopped; and

4. the evidence was insufficient to prove that he acted intentionally to evade arrest or detention.

Because the jury charge contained no error, we overrule Miller's first two issues. Because sufficient evidence supports both that Miller was lawfully stopped and that he

---

[1]As an alternate second issue, Miller asserts that he suffered egregious harm because the jury charge did not include a lesser-included offense. But he failed to brief that issue. Nonbriefed issues are waived, so we will not address it. *See Munoz v. State*, No. 11-14-00029-CR, 2017 WL 1321527, at *4 (Tex. App.—Eastland Apr. 6, 2017, no pet.) (mem. op., not designated for publication) (citing Tex. R. App. P. 38.1); *Howard v. State*, 137 S.W.3d 282, 286 n.2 (Tex. App.—Fort Worth 2004, pet. ref'd). Instead, we will address only that part of his second issue that he briefed, i.e., whether he suffered egregious harm when the fact issue related to his use or nonuse of his blinker was not submitted to the jury.

had acted intentionally, we overrule Miller's third and fourth issues. We affirm the trial court's judgment.

## I. Evidence

### A. Trooper Gomez detains Miller.

Trooper Jose Gomez testified that while stopped at an intersection, he saw a pickup pull into an Exxon gas station and stop between two pumps just as a Decatur police vehicle passed by. As soon as the patrol car cleared, the pickup immediately exited the parking lot. Suspicious, Trooper Gomez pulled into the Exxon parking lot with the intention of following the pickup and running its license plates.

The suspicious pickup stopped at a light, turned right, and then drove back into the Exxon parking lot "that he just came out of." Because Trooper Gomez believed that the pickup had not used its turn signal when turning right into the parking lot, Trooper Gomez initiated a traffic stop.

Trooper Gomez's car's dashcam videotaped the stop. Trooper Gomez asserted that the illuminating taillight seen on Miller's pickup as Miller pulled into the parking lot was a brake light, not a turn signal. Trooper Gomez explained that as vehicles entered the parking lot, a bump forced them to brake.

### B. Trooper Gomez's dashcam video neither confirms nor refutes whether Miller used his turn signal.

Trooper Gomez's dashcam video shows him on the service road for Highways 81 and 287 southbound sitting at the Highway 51 intersection stop light; the

3

Exxon gas station is across the street on the right corner. From Trooper Gomez's left on Highway 51, a Decatur police vehicle crosses the intersection and moves to Trooper Gomez's right. To Trooper Gomez's right on Highway 51, Miller's pickup can be seen pulling into the Exxon gas station just as the Decatur police vehicle and Miller's pickup were about to cross paths.

On the video, Miller's pickup pulls between two pumps, waits a few moments, and then somewhat abruptly loops back around toward the same Highway 51 exit that it had just entered. At the same moment, Trooper Gomez's traffic light turns green, he crosses the intersection, and he pulls into the Exxon parking lot from the Highways 81 and 287 service-road entrance; from there, he drives across the parking lot to the Highway 51 exit.

By the time Trooper Gomez crosses the parking lot, Miller has already left it, and his pickup can be seen at the intersection that Trooper Gomez had just traversed. The light is still red, and Miller is in the process of turning right onto the Highways 81 and 287 service road. During this turn, Miller's right turn signal is blinking.

Trooper Gomez follows Miller, but because Trooper Gomez's dashcam points forward, the camera loses Miller until Trooper Gomez completes his right turn onto the Highways 81 and 287 service road. By the time the camera captures Miller again, Miller is pulling back into the parking lot using the same Highways 81 and 287 service-road entrance that Trooper Gomez had used moments earlier to enter the parking lot. Because the video captures Miller just as he is completing his turn, whether Miller is

4

using his right turn signal or just tapping his brakes as he enters the parking lot is not clear.

Trooper Gomez activates his overhead lights just as Miller enters the parking lot and while Trooper Gomez is still on the service road. We can determine when Trooper Gomez activates his overhead lights by the reflections off a road sign and by the dashcam's audio's activating. When Trooper Gomez turns on his car's overhead lights, the dashcam records the video for the two minutes preceding the activation but records the audio only from the moment of activation. Miller was thus already pulling back into the Exxon parking lot before Trooper Gomez activated his overhead lights.

The video also shows that Miller's center rear brake light did not work.

## C. Trooper Gomez describes what happened next.

As Trooper Gomez drove up behind Miller's pickup, the car's passenger door opened. Trooper Gomez ordered the passenger to remain inside the pickup.

After approaching the vehicle, Trooper Gomez described the driver (Miller) as aggressive and argumentative. When Trooper Gomez told Miller that he had stopped him for failing to use his signal when he pulled into the gas station, Miller protested and insisted that he had signaled. Miller refused to provide his name and admitted that he was unable to provide a driver's license, that he had no insurance, that the pickup was not his, and that he had pulled back into the parking lot because he wanted to stay out of the officer's way.

5

At that point, Trooper Gomez decided to separate Miller and the passenger to see if each independently gave the same name for the driver. Miller responded by pleading with Trooper Gomez that he just wanted Trooper Gomez to leave him alone. Miller's pleading struck Trooper Gomez as odd because not having insurance did not explain why Miller wanted to avoid him. Trooper Gomez believed that something other than a lack of insurance was motivating Miller's behavior.

When Trooper Gomez persisted, Miller then volunteered that he had warrants. Trooper Gomez informed Miller that the Department of Public Safety was not, at that time, making arrests for Class C misdemeanor warrants, so if Miller's warrants were only for Class C misdemeanors, he would not arrest Miller.

Trooper Gomez directed Miller to get out of the pickup, but Miller remained inside. Attempting to calm Miller, Trooper Gomez continued to talk to him, and eventually Miller placed his vehicle in park and turned off the motor.

But by this time, Miller was angry at the passenger, who can be heard on the video saying something inaudible that prompted Miller to reply, "What do you mean? Don't what?" Trooper Gomez told Miller to hand him the keys, but Miller refused and, instead, turned his pickup back on. Trooper Gomez tried to call for backup, but his hand-held radio would not work. Trooper Gomez thought that Miller might try to flee.

Unable to get backup and faced with an argumentative and a noncompliant driver, Trooper Gomez opened the car door and tried to pull Miller out. Miller actively resisted and grabbed for the pickup's gears. While they struggled, Trooper Gomez

6

stated that Miller put the car in drive and accelerated forward, dragging him along with the pickup. Trooper Gomez maintained his feet and eventually freed himself, and anticipating that Miller would drive off, he ran back to his squad car.

Next, Trooper Gomez saw Miller's vehicle—without Miller—rolling backwards through the parking lot. He then observed the passenger run around the pickup to the driver's side. At that point, the pickup stopped.

**D. Miller flees and hides; Trooper Gomez pursues and tracks down Miller.**

In the confusion, Trooper Gomez lost sight of Miller, who had fled on foot, but he eventually found Miller hiding in some nearby brush. Trooper Gomez ordered Miller to show his hands; seeing none, Trooper Gomez drew his weapon.

**E. Trooper Womack arrives.**

Meanwhile, Trooper Chesley Womack arrived and saw Trooper Gomez with his weapon drawn and aimed at something. Trooper Womack then saw a man (Miller) come out from behind some bushes, run across a Sonic parking lot, jump a wall, and continue into a Chicken Express parking lot. Trooper Womack drove into the Chicken Express parking lot and intercepted Miller.

After getting out of his vehicle, Trooper Womack repeatedly ordered Miller to stop, but Miller ignored his orders. Trooper Womack then saw Miller reach for a large knife on his right side, so he took aim and tased Miller.

## F. Miller circles back.

While Trooper Womack chased Miller, an officer from the Decatur Police Department had joined Trooper Gomez. The two officers saw Miller running toward them with Trooper Womack in pursuit. Despite having been tased, Miller continued to resist the officers' attempts to place him in handcuffs.

## G. Miller's pickup's center brake light was out.

After watching his dashcam video at trial, Trooper Gomez said that the center brake light located on the back of Miller's pickup's cab was out. Trooper Gomez stated that driving without a functioning brake light violated the law.

## H. The passenger testifies.

Kymberly Knowles, the passenger, testified that Miller accelerated to get away from Trooper Gomez. Seeing the officer inside the pickup and his struggling to get Miller out while the pickup was moving, Knowles testified that she tried to stop the pickup by grabbing the gearshift and pushing it into park, but instead, she mistakenly pushed it into neutral. Knowles stated that once the pickup was in neutral, Miller jumped out and started running. At that point, the pickup rolled backwards, and Knowles leapt out and ran to the driver's side, where, she said, access to the gearshift was easier. Knowles testified that she then managed to stop the pickup.

According to Knowles, when Trooper Gomez pulled them over, Miller tossed a crumpled piece of paper into her lap, and she stuck that paper into her bra. The Tarrant

County Medical Examiner's Office later tested the contents of the crumpled piece of paper and determined that it contained methamphetamine.

## II. The Detention

We address Miller's first three issues together because all three turn on why Trooper Gomez detained Miller.

Whether a detention was proper is a legal issue, not a factual one. *Madden v. State*, 242 S.W.3d 504, 511 (Tex. Crim. App. 2007). Sometimes though, resolving a factual dispute is a prerequisite to resolving the legal issue. *See id.* "[T]he trial judge . . . decides what quality and quantum of facts are necessary to establish 'reasonable suspicion.' Only if one or more of those necessary facts are disputed does the judge ask the jury to decide whether the officer's belief in those facts was reasonable." *Id.*

In Miller's case, he maintains that there was a factual dispute over whether he signaled when re-entering the Exxon parking lot. He contends that (1) the jury should have been instructed that if it found that he had signaled, it was to disregard all the evidence that the detention produced because the detention was illegal; *see* Tex. Code Crim. Proc. Ann. art. 38.23(a); *Rodriguez v. State*, 578 S.W.2d 419, 420 (Tex. Crim. App. [Panel Op.] 1979); (2) whether he signaled should have been submitted in the jury charge; *see* Tex. Code Crim. Proc. Ann. art. 38.23(a); and (3) insufficient evidence supported the implied finding that he had not signaled; *see Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

9

For our purposes, because other evidence supported the implied finding that Trooper Gomez had properly detained Miller, whether Miller had signaled is moot. We thus deny all three issues. *See* Tex. R. App. P. 47.1.

## A. The nonfunctioning center brake light does not figure into our analysis.

To defeat the argument that other undisputed evidence justified the stop, Miller argues that we cannot rely on the center brake light's not functioning because Trooper Gomez did not notice that until after he reviewed the video. Because Trooper Gomez did not mention the nonfunctioning brake light until after viewing the video, we will assume, but not decide, that Miller is correct. Because an officer cannot retrofit later-discovered law violations to justify a stop, we do not rely on the nonfunctioning brake light in our detention analysis. *See State v. Houghton*, 384 S.W.3d 441, 449–50 (Tex. App.—Fort Worth 2012, no pet.); *State v. Ruelas*, 327 S.W.3d 321, 326–27 (Tex. App.—El Paso 2010, pet. ref'd).

## B. Did Miller fail to signal once, or did he fail to signal twice? Only once.

The State argues that Trooper Gomez testified that Miller failed to signal a right turn twice because Trooper Gomez, when describing Miller's turning back into the Exxon parking lot, said, "Once again, when he did that, he failed to use his turn signal." According to the State, Trooper Gomez was asserting that this was the second time that he had observed Miller's not signaling, first when Miller entered the parking lot to avoid the oncoming Decatur squad car and second when Miller re-entered the parking lot to avoid Trooper Gomez. The State argues that because we can rely on the first

instance, which Miller does not contest, any factual dispute over the second instance is moot. We are not persuaded.

In reviewing Trooper Gomez's testimony in its entirety, we note that he appeared to use the expression "once again" in the same way other people say "like I said before" or "as I was saying":

- "[O]nce again, that's when I noticed the pickup truck."

- "I told him. He didn't want to believe it. He kept saying -- he kept asking, ['W]hat did you stop me for?[']  I told him once again, stopped you for the -- for not using your turn signal."

- "So at that time he tried to -- he tried to plead with me that, you know, all he was trying to do was get out of my way, to leave him alone. And once again, that's another indicator of ['W]hy are you telling me this?[']"

- "Well, at that time I believe I asked him to -- to step out again, and once again he -- he was not compliant in getting out."

- "I tell him, hey, let me have your keys. And that's when he tells me, ['H]ey, I'm not gonna leave.[']  Once again, I don't know that."

- "So once we -- once Mr. Miller got tased, at this point we were trying to get his -- grab his hands to handcuff him. Mr. Miller once again was not compliant."

- "So Mr. -- but Trooper Womack tries again to get compliance with Mr. Miller, because once again he -- he was noncompliant."

- "[The pickup] accelerates. So it -- once again, it happened. It -- it was quick."

- "And he turns the truck back on. So at that time I'm, ['A]ll right, what he's trying to do is he's not complying,['] once again."

11

- "I asked him for the keys. Because once again, I was trying to keep Mr. Miller from leaving the scene."

- "He -- he turned on the truck. And at this time, I believe, as I was listening to the other radio traffic, I was listening to Trooper Womack's radio traffic at that time. So at that time, I was trying to once again calm the whole situation down."

- "So at that time we were not taking any -- we were not even confirming Class Cs. No, I was -- I was not lying. I was being honest during the whole traffic stop. I said -- I told him -- warning -- I told him, ['N]o, I did not -- I do not care about the warrants[,'] because once again, I can't take him to jail if I'm not confirming on the Class C tickets, which all the agencies are doing nowadays."

We also note that Trooper Gomez did not activate his overhead lights until after Miller had re-entered the Exxon parking lot. Had Trooper Gomez seen Miller's not signaling his turn when avoiding the Decatur patrol car, given Trooper Gomez's suspicions, he presumably would have activated his overhead lights long before Miller re-entered the parking lot. Other than the use of this phrase, there is no other indication in the record that Trooper Gomez observed two instances of Miller's failing to signal a turn. For these reasons, we disagree with the State's contention that Trooper Gomez, by using the expression, "once again," was asserting that he had witnessed Miller's failing to signal twice.

12

**C. Trooper Gomez had reasonable suspicion based on Miller's twice avoiding law enforcement by pulling into the Exxon gas station.**

### 1. Trooper Gomez needed only reasonable suspicion.

Routine traffic stops are similar to investigative detentions.[2] *Martinez v. State*, 236 S.W.3d 361, 369 (Tex. App.—Fort Worth 2007, pet. dism'd, untimely filed). An officer may initiate a traffic stop if the officer has reasonable suspicion that a crime was or is about to be committed. *See Guerra v. State*, 432 S.W.3d 905, 911 (Tex. Crim. App. 2014). For reasonable suspicion to exist, the officer does not have to witness an actual violation; rather, the officer needs only "a reasonable suspicion" that a violation has occurred or is about to occur. *See Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015). "In assessing whether the intrusion was reasonable, an objective standard is utilized: would the facts available to the officer at the moment of the seizure . . . warrant a [person] of reasonable caution [to] belie[ve] that the action taken was appropriate." *Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997). "[T]he subjective intent of the officer conducting the stop is irrelevant." *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). We consider the totality of the circumstances when assessing a stop's propriety. *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997). An officer's stated reason for the stop is not controlling if the evidence shows an objectively reasonable basis for the stop. *See Garcia*, 43 S.W.3d at

---

[2]Investigative detentions are less intrusive than arrests. *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011).

530. "A law enforcement officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks evidence rising to the level of 'probable cause.'" *Ruelas*, 327 S.W.3d at 326. Although the State need not establish with absolute certainty that a crime has occurred, the State must elicit testimony of sufficient facts to create a reasonable suspicion that a law has been or is about to be violated. *See Garcia*, 43 S.W.3d at 530; *Ruelas*, 327 S.W.3d at 326. Provided reasonable suspicion supports a traffic stop, the detention does not violate Texas law. *Guerra*, 432 S.W.3d at 911.

Appellate courts "review *de novo* whether the totality of circumstances is sufficient to support an officer's reasonable suspicion of criminal activity." *Crain v. State*, 315 S.W.3d 43, 48–49 (Tex. Crim. App. 2010); *State v. Wood*, 575 S.W.3d 929, 932–33 (Tex. App.—Austin 2019, pet. ref'd). In conducting the totality of the circumstances determination, we use a bifurcated standard of review: (1) we give almost total deference to a trial court's determination of historical facts and application of law to fact questions that turn on credibility and demeanor, and (2) we review de novo application of law to fact questions that do not turn on credibility and demeanor. *Garcia*, 43 S.W.3d at 530. In other words, we give almost total deference to the trial court in determining what the actual facts are, and we review de novo whether those facts are sufficient to give rise to reasonable suspicion. *Id.*

14

Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676 (2000). A driver's behavior, such as erratic driving or obvious attempts to evade officers, may be relevant and can support a reasonable suspicion. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885, 95 S. Ct. 2574, 2582 (1975); *Hernandez v. State*, No. 13-17-00649-CR, 2019 WL 5608239, at *6 (Tex. App.—Corpus Christi-Edinburg Oct. 31, 2019, no pet.) (mem. op., not designated for publication). "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124, 120 S. Ct. at 676. "In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists." *Id.* at 124–25, 120 S. Ct. at 676. "Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Id.* at 125, 120 S. Ct. at 676.

Conduct that is not criminal in itself can give rise to suspicion that illegal conduct is taking place. *United States v. Sokolow*, 490 U.S. 1, 9–10, 109 S. Ct. 1581, 1586–87 (1989); *Crockett v. State*, 803 S.W.2d 308, 311 (Tex. Crim. App. 1991). Circumstances may include perfectly lawful acts that in some measure render the likelihood of criminal conduct greater. *Sokolow*, 490 U.S. at 9–10, 109 S. Ct. at 1586–87; *Crockett*, 803 S.W.2d at 311. For example, in *Terry v. Ohio,* an officer observed men engaging in what were—

15

when viewed separately—innocent acts but which—when taken collectively—looked suspiciously like men "casing" a business before committing a crime. 392 U.S. 1, 6, 22–23, 88 S. Ct. 1868, 1872, 1880–81 (1968).  The Supreme Court wrote that the dispute was not over the officer's detaining the men but, rather, over the officer's patting the men down for his own safety as part of that detention. *Id.* at 23, 88 S. Ct. at 1881.

### 2.  Trooper Gomez had objective reasonable suspicion.

Even without the disputed turn signal, Trooper Gomez had objective reasonable suspicion to stop Miller.

Trooper Gomez observed Miller pull into the Exxon gas station just as a Decatur patrol car was approaching Miller.  Miller then doubled back to the road without stopping to get gas after the patrol car had passed.  Miller's action in dodging the patrol car is what initially caught Trooper Gomez's attention and made him suspicious.

Trooper Gomez intended to follow Miller's pickup so that he could run Miller's license plates, but even as Trooper Gomez followed Miller, Miller pulled back into the same Exxon gas station that he had just exited.  Objectively, Trooper Gomez now had two instances of Miller's conspicuously attempting to avoid law enforcement.  Even if Miller had signaled his turn, Trooper Gomez had a reasonable suspicion that Miller was engaging in or was about to engage in some sort of illegal activity.

Viewing the totality of the circumstances, even without the disputed failure to signal, we conclude that Trooper Gomez had reasonable suspicion to detain Miller.  Miller was conspicuously trying to evade detection by law enforcement.  "And if other

16

facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence." *Madden*, 242 S.W.3d at 510. Because other evidence mooted the disputed failure to signal, we overrule Miller's first three issues. *See* Tex. R. App. P. 47.1.

### III. Sufficiency of the Evidence

In Miller's fourth issue, he argues that the evidence was insufficient to prove that he acted intentionally to evade detention or arrest. Miller contends that during the detention, he was trying to cooperate with Trooper Gomez, but his pickup was in drive, and his foot must have slipped off the brake. Miller also argues that when Trooper Womack was chasing him, Miller ran toward Trooper Gomez and the other officer, an act that Miller maintains is inconsistent with fleeing.

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman*, 520 S.W.3d at 622. This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

17

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

## B. Discussion

The dashcam shows that while Trooper Gomez and Miller were talking, Miller turned on his pickup and assured Trooper Gomez that he was not going to "burn off" on him. But when Trooper Gomez reached into the cab, the pickup did not merely roll forward, it accelerated forward. Both Trooper Gomez and Knowles thought that Miller had accelerated to escape.

Furthermore, before the pickup accelerated, Miller had pleaded with Trooper Gomez to leave him alone. And after the pickup accelerated, Miller ran away. Notably, he did not check on Trooper Gomez's safety, as might happen if Miller had accidentally lurched forward. And when Trooper Womack confronted Miller, Miller ran again. The

18

fact that Miller, when being chased by Trooper Womack, ran in the general direction of Trooper Gomez and the other officer does not necessarily negate flight. Even after Trooper Womack tased him, Miller was resistant to arrest. And if Knowles is to be believed, Miller had a reason to avoid detention because he had methamphetamine on him. Viewing all the evidence in the light most favorable to the verdict, we hold that a rational factfinder could have found Miller intentionally used a vehicle to evade detention or arrest beyond a reasonable doubt. *See Queeman*, 520 S.W.3d at 622. We overrule Miller's fourth issue.

## IV. Conclusion

Having overruled Miller's four issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 13, 2021